UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

OCA, INC., ET AL.                           CIVIL ACTION

VERSUS                                      NO: 07-3667

BRENT HASSEL, D.D.S., P.S.,                 SECTION: R(3)
ET AL.


OCA, INC., ET AL.                           CIVIL ACTION

VERSUS                                      NO: 07-3669

JENNIFER A. MEADER, D.M.D.,                 SECTION: R(3)
P.C., ET AL.


## ORDER AND REASONS

Before the Court is an appeal from the judgment of the
United States Bankruptcy Court, Eastern District of Louisiana, in
*In re OCA, Inc.*, granting the motion for summary judgment filed
by two orthodontists from the State of Washington, Dr. Brent
Hassel and Dr. Jennifer Meader, who entered into business service
agreements (BSAs) with OCA. The bankruptcy court granted the
doctors' joint motion for summary judgment that the BSAs are

invalid under Washington law. For the following reasons, the
Court AFFIRMS the judgment of the bankruptcy court.

**I.    BACKGROUND**

This matter arises out of a soured business relationship
between private orthodontic practices in the State of Washington
and their provider of business, financial, and office management
services, Orthodontic Centers of America, Inc. (OCA). OCA
operates through a network of wholly owned subsidiaries named
according to the states in which OCA does business (*e.g.*,
Orthodontic Centers of Washington, Inc.). Through its
subsidiaries, OCA entered into long-term business service
agreements (BSAs) with doctors in about 250 practices nationwide
to provide office management and patient billing support among
other services. Under the BSAs, the doctors pay OCA a monthly
service fee based upon a percentage of their operating profit or
practice revenue. The BSAs are OCA's primary asset and the source
of nearly all its revenue.

In 1995, Dr. Brent Hassel, an orthodontist in Tacoma,
Washington, entered into a BSA with OCA. A year later in 1996,
Dr. Jennifer A. Meader, an orthodontist in Seattle, Washington,
entered into a BSA virtually identical to Dr. Hassel's. Under
these two BSAs, the doctors agreed to pay OCA $22.22 for each

2

"patient hour" from each practice, as well as 50 percent of each practice's profits. (*See* Hassel BSA at ¶¶ 3.1, 3.4; Meader BSA at ¶ 4.3). OCA agreed to provide a range of office and business services under each BSA. Essentially, the arrangement was for OCA to take care of business functions so that the doctors could practice medicine free of administrative hassles. OCA was responsible for recruiting, hiring, and training office staff and setting staff schedules; providing and maintaining the practices' offices and communications; marketing; creating and maintaining financial software for the practices; providing legal services; conducting payroll administration and accounting; performing bookkeeping and financial functions such as billing and collection and disbursement of accounts receivable. (*See* Hassel BSA at ¶¶ 1.1-1.12; Meader BSA at ¶¶ 2.1-2.15). OCA held exclusive control over the practices' revenues and bank accounts, which prevented the doctors from drawing funds from these accounts. (*See* Hassel BSA at ¶¶ at 1.10, 1.11; Meader BSA at ¶¶ 2.12, 2.13). In addition, OCA owned the practices' office equipment and furnishings and leased these items to the practices. (*See* Hassel BSA at ¶ 1.2; Meader BSA at ¶ 2.2). The BSAs were to last for terms of 20 years, and at its sole discretion, OCA had the option of extending each of the BSAs for

two additional terms of 10 years each. (*See* Hassel BSA at ¶ 5.1;
Meader BSA at ¶ 6.1).

At some point, the business relationships between the
doctors and OCA became strained. According to OCA, both doctors
began to default under the BSAs. The doctors claim that OCA
failed to provide promised services and was mismanaging their
assets. The doctors' alleged default was part of a much larger
trend that OCA experienced with affiliated doctors across the
country. As more doctors began to default under their BSAs, OCA's
revenue stream evaporated. On March 14, 2006, OCA and most of its
subsidiaries filed Chapter 11 petitions under the Bankruptcy Code
the Bankruptcy Court for the Eastern District of Louisiana. A
small number of additional subsidiaries filed Chapter 11
petitions on March 17 and June 2, 2006. All of the debtors' cases
have been consolidated into one case.

On June 14, 2006, Dr. Meader filed an adversary complaint
against OCA in the bankruptcy court, bringing claims for breach
of contract and breach of fiduciary duty, and a request for a
declaratory judgment that her BSA is illegal under Washington
law. OCA filed a counterclaim seeking declaratory relief,
specific performance, reformation of the contract, and fees and
costs. On June 23, 2006, OCA instituted an adversary proceeding
against Dr. Hassel, brining claims for declaratory relief,

4

specific performance, reformation of contract, breach of
contract, promissory estoppel, conversion, unjust enrichment,
quantum meruit, fraudulent conveyance, and attorneys' fees and
court costs. Dr. Hassel then filed a counterclaim against OCA,
alleging breach of contract and breach of fiduciary duty, and
seeking a declaratory judgment that his BSA was illegal under
Washington law. Drs. Hassel and Meader then filed a joint motion
for summary judgment on the issue of whether their BSAs were
illegal under Washington law, which bars corporations from owning
or operating dental practices. After hearing oral arguments, the
bankruptcy court held that the BSAs are illegal under Washington
law and dismissed the parties' remaining claims, freeing the
parties of all obligations toward each other, and requiring each
doctor to assume his or her practice's liabilities. OCA filed a
timely notice of appeal and now seeks reversal of the bankruptcy
court's judgment.


**II.  JURISDICTION**

     This Court has jurisdiction over this case under 28 U.S.C. §
158(a) and Federal Rule of Bankruptcy Procedure 8001.

## III. LEGAL STANDARDS

### A.    Standard of Review

The standard of review for a bankruptcy appeal by a district court is the same as when a court of appeals reviews a district court proceeding. *See* 28 U.S.C. § 158(c)(2). Accordingly, the Court reviews the bankruptcy court's conclusions of law *de novo*, findings of fact for clear error, and mixed questions of law and fact *de novo*. *See In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000).

The Court reviews the bankruptcy court's grant of summary judgment *de novo*. Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325; *see also Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See Celotex*, 477 U.S. at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue exists for trial. *See id.* at 325; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).

**B.   Choice of Law**

The bankruptcy court correctly applied the law of the State of Washington to this dispute. Both BSAs at issue contain choice of law provisions that Washington law will govern any dispute arising out of the contracts. (*See* Hassel BSA at ¶ 8.5; Meader BSA at ¶ 9.5). In addition, performance under the agreements largely took place in Washington. Finally, no party disputed that Washington law applies.

OCA raises two issues on appeal. First, OCA disputes the bankruptcy court's finding that the BSAs are illegal under Washington law. The bankruptcy court concluded that in light of

OCA's sharing in the practices' profits, the pervasiveness of its influence over the operation of the practices, and the long duration of the BSAs, OCA had essentially owned, maintained, or operated offices for the practice of dentistry and thus engaged in the practice of dentistry in violation of Washington law. OCA maintains, however, that it did not have a sufficient interest in the orthodontic practices of Dr. Hassel and Dr. Meader under the BSAs such that it engaged in the practice of dentistry, which would render the BSAs invalid under Washington law as against public policy. Second, OCA challenges the bankruptcy court's finding that the parties were *in pari delicto*, therefore making the BSAs complete nullities under Washington law, and the bankruptcy court's decision to leave the parties where it found them. The bankruptcy court determined that the parties were well aware of the terms of the BSAs and their potential illegality under Washington law prohibiting the corporate practice of dentistry and that the objectionable terms of the agreements that defined the basic business relationships between OCA and the doctors — *e.g.,* the profit-sharing scheme, the duration, and the extent of OCA's control — rendered the BSAs illegal in their entirety. OCA contends that the illegal provisions of the BSAs were severable from the other aspects of the BSAs.

**IV.  DISCUSSION**

**A.  The Invalidity of the BSAs under Washington Law**

The Court finds no error in the bankruptcy court's application of Washington law to find the BSAs illegal. Washington law prohibits the corporate practice of dentistry and other learned professions that affect the public health and welfare, such as law, medicine, and optometry. *See Morelli v. Ehsan*, 756 P.2d 129, 131 (Wash. 1988); *State v. Boren*, 219 P.2d 566 (Wash. 1950); *State ex rel. Standard Optical Co. v. Superior Court for Chelan County*, 135 P.2d 839 (1943). Two sections of the Revised Code of Washington are pertinent to the analysis of whether the BSAs are against public policy. Under § 18.32.020, a person or entity practices dentistry who

> (1) represents himself as being able to diagnose, treat, remove stains any concretions from teeth, operate or prescribe for any disease, pain, injury, deficiency, deformity, or physical condition of the human teeth, alveolar process, gums, or jaw, or (2) offers or undertakes by any means or methods to diagnose, treat, remove stains or concretions from teeth, operate or prescribe for any disease, pain, injury, deficiency, deformity, or physical condition of the same, or take impressions of the teeth or jaw, or (3) owns, maintains or operates an office for the practice of dentistry, or (4) engages in any of the practices included in the curricula of recognized and approved dental schools or colleges, or (5) professes to the public by any method to furnish, supply, construct, reproduce, or repair any prosthetic denture, bridge, appliance, or other structure to be worn in the human mouth.

Rev. Code Wash. § 18.32.020. Section 18.32.675 further provides:

> No corporation shall practice dentistry or shall solicit
> through itself, or its agents, officers or employees,
> directors or trustees, dental patronage for any dentists or
> dental surgeons employed by any corporation: . . . PROVIDED,
> FURTHER, That such dental services shall be rendered at no
> cost or charge to the employees; nor shall it apply to
> corporations or association in which the dental services
> were originated and are being conducted upon a purely
> charitable basis for the worthy poor, nor shall it apply to
> corporations or associations furnishing information or
> clerical services which can be furnished by persons not
> licensed to practice dentistry, to any person lawfully
> engaged in the practice of dentistry, when such dentist
> assumes full responsibility for such information and
> services.

Rev. Code Wash. § 18.32.675. The doctors do not contend that OCA engages in the practice of dentistry or orthodontics by providing actual health care to patients in the way of cleaning teeth, performing root canals, or fitting patients with braces. The issues are whether under the BSAs, OCA "*owns, maintains or operates* [the offices of Dr. Hassel and Dr. Meader] for the practice of dentistry, Rev. Code Wash. § 18.32.020(3) (emphasis added), and whether the individual doctors have assumed "*full responsibility*" for the information and clerical services that OCA provides. Rev. Code Wash. § 18.32.675 (emphasis added).

The Washington Supreme Court has explained that the prohibition against the corporate practice of dentistry is to maintain a high standard of professional care by making doctors directly responsible to their patients, rather than to the interests of a corporation. *Boren*, 219 P.2d at 528. The court in

10

*Boren* spelled out the rationale against the corporate practice of dentistry as follows:

> [P]rofessional standards would be practically destroyed, and professions requiring special training would be commercialized to the public detriment. The ethics of any profession is based upon personal or individual responsibility. One who practices a profession is responsible directly to his patient or his client. Hence he cannot properly act in the practice of his vocation as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character.

*Id.* (quoting *Ezell v. Ritholz*, 198 S.E. 419, 424 (S.C. 1938)). *See also Standard Optical*, 135 P.2d at 842-43 (quoting same in context of practice of optometry).

On several occasions, Washington courts have held that business relationships between licensed dentists or other professionals and non-professionals that further the provision of professional care violate the statutory prohibitions against the corporate practice of dentistry and other professions. The cases have involved situations in which corporations or business partnerships employed licensed professionals, *see, e.g., Standard Optical*, 135 P.2d at 840-41 (involving corporate employment of licensed optometrists), and mixed partnerships in which some of the partners were licensed professionals and others were not, *see, e.g., Fallahzadeh v. Ghorbanian*, 82 P.3d 684, 685 (Wash. Ct. App. 2004) (involving partnership between licensed dentist and

11

non-dentist that owned office building leased to licensed dentist's practice); *Morelli*, 756 P.2d at 129-30 (involving partnership between licensed physician and non-doctor for establishment and operation of family care clinic). *See also Boren*, 219 P.2d at 567-68 (involving partnership and profit-sharing between licensed dentist and non-dentist for operation of dentist office). In two recent cases that present virtually identical factual scenarios as the controversies between OCA and Drs. Hassel and Meader, Washington courts have ruled that business relationships that are not formal partnerships in name but exhibit qualities of profit-sharing partnerships run afoul of Washington law. *See Nicholson v. Orthodontic Centers of Washington, Inc.*, No. 05-2-33958-6, slip op. (Wash. Super. Ct. Mar. 28, 2007) (holding that BSA between Washington dentist and OCA and OCA's Washington subsidiary, Orthodontic Centers of Washington, Inc., invalid as against public policy); *Engst v. Orthalliance, Inc.*, No. C01-1469C, slip op. (W.D. Wash. Mar. 1, 2004) (Coughenour, C.J.) (holding contract between licensed dentist and non-dentist provider of administrative support illegal because of nature of non-dentist service provider's control over office operations and profit-sharing arrangement).

From these cases emerge two guiding principles about when a corporation, by way of a contractual relationship with a licensed

12

dentist, owns, maintains, or operates a dental practice in violation of Washington law. First, a corporation that owns a business that provides dental or other professional services outright and employs licensed professionals is clearly engaged in the unlawful corporate practice of dentistry. In *Standard Optical*, which was decided under the Washington law governing the practice of optometry, the Washington Supreme Court held that a corporation that advertised it was practicing optometry and employed licensed optometrists owned and operated an optometry practice, despite not exercising control over the optometrists' professional decisions concerning individual clients. *Standard Optical*, 135 P.2d at 840-41, 844. The cases here do not present situations in which OCA completely owns orthodontic practices and employs licensed orthodontists or provides medical care in the way that the corporation in *Standard Optical* employed licensed optometrists. The individual doctors own their practices and have entered into a long-term services contract with OCA. But courts that have analyzed whether a corporation is engaged in the practice of dentistry do not stop at the question of whether the corporation formally employs a licensed dentist.

Second, in situations in which a corporation does not own a dental practice outright or does not formally employ dentists, courts look past the nominal characterization of the relationship

13

to the purpose and effect of the agreement to determine whether the corporation engages in the *de facto* practice of dentistry as defined by the statute. They consider whether the relationship between a licensed professional and a corporate entity is, in effect, a partnership or arrangement in which the corporation is so entangled with the affairs of the practice that it effectively maintains or operates a dental practice. *See, e.g., Fallahzadeh*, 82 P.3d at 686 (considering the "'reality' of the parties' business relationship); *Engst*, No. C01-1469C, slip op. at 7-8, 11 (looking through the "web of contractual relationships" between the orthodontists and corporation to determine whether the corporation was the *de facto* owner or operator). In determining whether an illegal business relationship between a licensed dentist and a corporation exists, courts consider two factors in tandem: (1) the extent to which the corporation exercises control over the practice's operations; and (2) the nature of the payment scheme between the practice and the corporation.

    In cases in which the non-dentist or corporation had the power to influence the operation of the practice even though it did not own the practice or employ the dentist, Washington courts have found that the non-dentist entity effectively operated or maintained the practice. For example, in *Fallahzadeh v. Ghorbanian*, 82 P.3d 684 (Wash. Ct. App. 2004), the court

concluded that because the non-dentist individual had title to the dental practice's office space, equipment, and furnishings and leased these items to the dentist, he exercised control over "certain aspects of the [dentist's] practice, such as making physical improvements to the premises that might be necessary for patient care." *Id.* at 687. In *Fallahzadeh*, the dentist leased his office building, equipment, and furnishings from a non-dentist, whom he also employed as the office manager. The business relationship between the dentist and non-dentist fizzled, and the court found that the lease arrangement between the two illegally allowed the non-dentist to control the practice because it invested the non-dentist with control over the physical assets of the practice. *Id.*

More recently, the courts in *Engst v. Orthalliance*, No. C01-1469C, slip op. (W.D. Wash. Mar. 1, 2004), and *Nicholson v. Orthodontic Centers of Washington, Inc.*, No. 05-2-33958-6, slip op. (Sup. Ct. Wash. Mar. 28, 2007), held that service contracts between licensed orthodontists and corporations were illegal, in part, because the corporations possessed an impermissibly high degree of control over the practices' operations under the agreements. Under the agreements at issue in *Engst,* the corporation was for responsible office facilities and equipment, personnel and payroll, business systems, purchasing and forms,

15

purchasing and inventory control, accounting and financial
services, marketing assistance, billing collection services,
payment and distribution of funds, and recordkeeping. *Engst*, slip
op. at 2. In addition, the corporation recruited, employed,
trained, and scheduled office staff. Similarly, under the
disputed agreement in *Nicholson*, the orthodontist was required to
use computer and information systems as dictated by OCA, maintain
certain office hours, and adhere to an OCA-established dress
code. *Nicholson*, slip op. at 3. OCA assumed responsibility for
recruiting and hiring employees and setting their rates of pay,
subject to the orthodontist's approval. *Id*. at 4. OCA further had
signatory authority over the practice's bank account, was
responsible for making disbursements from that account, purchased
the practice's accounts receivable each month, and generally
shared ownership in the practice's revenues and liabilities. *Id.*
In addition, OCA acquired ownership over the practice's office
fixtures and equipment and leased those items back to the
orthodontist. *Id.*

Washington courts have also rejected the argument that a
non-dentist or corporation cannot own, operate, or maintain a
dental practice so long as it is not involved in the delivery of
professional services to patients. A corporation's "non-
involvement in the delivery of professional services is not

16

determinative" of whether it owns or operates a dental practice.
*Fallahzadeh*, 82 P.3d at 686-87. *See also Standard Optical*, 135
P.2d at 844. In *Fallahzadeh*, the non-dentist unsuccessfully
argued that the dentist had "complete control of all business and
professional activities for his practice," as evidenced by the
dentist's decision to terminate the employment of the non-dentist
as office manager. The non-dentist had reserved significant
rights under the lease agreement as landlord. Although he may not
have had authority to make decisions about the care of individual
patients, he had "sole and exclusive discretion to approve any
changes, modifications, or alterations" to the practice's
facilities and equipment, which could affect patient-care
decisions. *Id.* at 687. Likewise, in *Engst* and *Nicholson*, the
courts dismissed as irrelevant the corporations' arguments that,
because they were not involved in the delivery of professional
services to patients, they did not effectively own, maintain, or
operate dental practices. *See Engst*, slip op. at 11; *Nicholson*,
slip op. at 3. In those cases, the corporations controlled the
practices' office space and equipment, controlled the practices'
bank accounts, and handled the scheduling of office staff, among
other things. *See also Morelli*, 756 P.2d 131-32 (rejecting non-
physician's argument that he was only a business manager and did

17

not operate a medical practice because he was responsible for hiring nurses and retained equal management rights).

When a contract gives a non-dentist or corporation the power to influence the operation of a dental practice and a share in that practice's profits, Washington courts have repeatedly held that such agreements are illegal as against public policy. *See Morelli*, 756 P.2d at 132; *Boren*, 219 P.2d at 524; *Fallahzadeh*, 82 P.3d at 687; *Engst*, slip op. at 13-14; *Nicholson*, slip op. at 4-5. An agreement that ties a corporation's payment to a practice's profits, gives the corporation a "substantial beneficial interest in the practice's profits." *Fallahzadeh*, 82 P.3d at 687. The coupling of profit-sharing and substantial control over a practice's operations, raises precisely the kinds of public health and welfare concerns that the prohibition against the corporate practice of dentistry is intended to address. *Id.* Such an arrangement potentially puts the interests of patients at odds with the interest of the corporation. *Id.*

Here, the bankruptcy court correctly determined that OCA effectively owned, maintained, and operated the orthodontic practices of Drs. Hassel and Meader. Under the BSAs, OCA was responsible for employing and training office staff, providing and maintaining office space, marketing, and administering the practices' payrolls. OCA handled all bookkeeping and financial

18

tasks for each practice, and it controlled the practices' bank accounts. It also retained ownership over office equipment that it leased to the doctors. OCA had a 50 percent interest in the practices' profits in addition to receiving $22.22 for each patient hour. Further, the BSAs gave OCA these interests for as much as 40 years. Considering the degree of OCA's control over the practices' operations and its beneficial interest in the practices' profits, the bankruptcy court's decision is squarely in line with the several Washington decisions discussed *supra*. Indeed, the cases on appeal are virtually indistinguishable from the recent decisions in *Engst* and *Nicholson*, which involved contracts formed between orthodontists and OCA and a company acquired by OCA.

OCA makes much of the fact that it was not involved in the provision of professional orthodontic services to patients and that the doctors retained authority over staffing level and compensation decisions. Those factors are not controlling on the issue of whether OCA effectively owns, maintains, or operates offices for the practice of dentistry. *See Fallahzadeh*, 82 P.3d at 686; *Standard Optical*, 135 P.2d at 844. Simply because OCA refrained from getting involved in making decisions about the care of individual patients does not mean that it lacked the requisite interest in, or control over, the practices to make it

19

an effective owner or operator. On the contrary, the terms of the BSAs gave OCA the same kinds of control and interests that Washington courts have repeatedly found to make non-professional corporations effective owners or operators of professional dentists' offices. OCA urges that it did not enter into formal partnerships with Drs. Hassel and Meader. Be that as it may, in reality, OCA's business relationships with the orthodontists were ones in which OCA controlled significant aspects of the orthodontic practices, shared in their profits, and played an active role in their operations. OCA was not a mere investor or involved in arms-length transactions with these orthodontic practices.

OCA's reliance on *Prichard v. Conway*, 234 P.2d 872 (Wash. 1951), is misplaced. In *Prichard* the widow of a deceased dentist sold her deceased husband's dental practice to a licensed dentist in exchange for monthly installment payments for 10 years and a share of the practice's profits for the first five years. The widow also remained as the business manager for the practice. Considering the contract between the parties and the widow's specific duties as office manager, the Washington Supreme Court concluded that the widow's continuing involvement in the administration of the practice did not amount to ownership, management, or operation of an office of a dental practice. *Id.*

20

at 876. The Washington Supreme Court decided *Prichard* only two years after deciding *Boren*, in which it held that a conditional sales agreement under which a non-dentist worked as the practice's business manager and received fluctuating "bonus" payments tied to the practice's profits was illegal. 219 P.2d at 568. The *Prichard* court sounded a note of caution about its holding. Although it found in the particular context of *Prichard* that the widow's conditional sale of the dental practice and her continuing involvement in the management of the practice did not "of necessity constitute [illegal] ownership, maintenance, or operation" of a dental practice, the court emphasized that such an arrangement "could well be a factor requiring a closer scrutiny of the entire transaction to determine whether it is actually what it purports to be or, instead, a scheme or subterfuge to violate the law." *Id.* Moreover, *Prichard* is the only decision in which a Washington court has found circumstances in which a non-dentist's control over the administration of a dental practice and that individual's interest in the business's profits does not violate Washington law. In the cases discussed, *supra*, the corporations argued that they occupied a similar position as the individual widow in *Prichard*. In each case, the court distinguished *Prichard* on its particular facts. *See, e.g., Engst*, slip op. at 12; *Fallahzadeh*, 82 P.3d at 687; *Morelli*, 756

21

P.2d at 131-32. This Court declines OCA's invitation to extend
the holding in *Prichard* to a factual scenario that no other court
has. Accordingly, the Court concludes that the bankruptcy court
correctly held that OCA effectively owned, maintained, or
operated the orthodontic practices of Drs. Hassel and Meader,
thus rendering the BSAs illegal under Washington law.

   **B.   Effect of the Illegal BSAs**

   Having determined that the BSAs violate Washington law, the
Court next addresses OCA's challenge to the bankruptcy court's
conclusion as to the effect of the illegality of the BSAs. The
bankruptcy court correctly held that the BSAs are unenforceable
under Washington law because they violate the clear public policy
against the corporate practice of dentistry. In addition, the
bankruptcy court correctly found that the parties are *in pari
delicto* and that under Washington law, they should be left where
the court found them.

   Under Washington law, if a business agreement is illegal, a
court will not consider an action for an "accounting and
distribution of assets, especially when the unlawful agreement is
contrary to public policy." *Morelli*, 756 P.2d at 133. (citing
*Browner v. Johnson*, 352 P.2d 814 (Wash. 1960); *Red Devil
Fireworks Co. v. Siddle*, 648 P.2d 468 (Wash. 1982)). That
practice is informed by the principle that "illegal agreements

are void, and courts will not enforce them." *Id.* (citation

omitted). In general, the court will leave the parties where it

found them, regardless of the inequities of their positions.

*Sherwood & Roberts Yakima, Inc. v.* Leach, 409 P.2d 160 (1965);

*Hederman v. George*, 212 P.2d 841 (Wash. 1949). A court may depart

from this rule when the parties are not *in pari delicto*, allowing

the less culpable party to maintain an action based on the

illegal contract. *Morelli*, 756 P.2d at 132 (citing *Sherwood &*

*Roberts-Yakima*, 409 P.2d at 164).

   The bankruptcy court correctly found that the parties were

equally at fault or *in pari delicto*. As the bankruptcy court

noted, OCA

> is a party to numerous similar agreements and is certainly
> aware of the prohibitions on the corporate practice of
> dentistry, and the doctors have not made any claim that they
> were duped into signing the agreement unaware of the
> provisions of the Washington law that the agreement
> violated. Thus, the parties are equally at fault.

*OCA v. Hassel*, Adv. P. No. 06-1162, slip op. at 14 (Bankr. E.D.

La. June 1, 2007). There is no error in the bankruptcy court's

conclusion. Hence the exception is not applicable.

   OCA's arguments about the effect of the severability clauses

in each BSA are also without merit. Each agreement contains a

clause that if a provision of the agreement is held to be

illegal, then it shall be severed from the agreement, leaving the

remainder effective and binding upon the parties. (*See* Hassel BSA at ¶ 8.8; Meader BSA at ¶ 9.8). OCA contends that because Washington law favors the enforcement of contractual terms expressing the parties' intent, the Court should give effect to the severability clauses of the BSAs. It relies on the Washington Supreme Court's recognition in *Zuver v. Airtouch Communications, Inc.*, 103 P.3d 753 (Wash. 2004), and *Adler v. Fred Lind Manor*, 103 P.3d 773 (Wash. 2004), that a court may sever unconscionable provisions of a contract and retain valid clauses. *Zuver*, 103 P.3d at 768; *Adler*, 103 P.3d at 788 (quoting Restatement (Second) of Contracts § 208). *Zuver* and *Adler* dealt with the severability of arbitration clauses in employment contracts. The arbitration clauses in those contracts could be easily severed, leaving the employment agreements largely intact. The extent to which a contract is divisible is the guiding principle on whether to sever a particular provision from a contract. The Washington Supreme Court has noted that

> '[w]hether a contract is entire or divisible depends very largely on its terms and on the intention of the parties disclosed by its terms. As a general rule a contract is entire when by its terms, nature and purpose, it contemplates and intends that each and all of its parts are interdependent and common to one another and to the consideration.'

*Adler*, 103 P.3d at 788 n.14 (quoting *Saletic v. Stamnes*, 321 P.2d 547, 550 (Wash. 1958)).

OCA's argument fails because the illegal elements of the BSAs are the *sine qua non* of the agreements. Unlike the situation in *Zuver* and *Adler*, there is no apparent way to excise the unlawful provisions and leave anything to govern a relationship between OCA and the doctors. As the *Engst* court observed in rejecting a similar argument in favor of severing illegal contractual provisions to the one that OCA makes here, "it is the *entire relationship* between the parties which is in contravention of the law." *Engst*, slip op. at 16 (emphasis in original). The same is true here, as the fundamental business arrangement between OCA and the doctors is illegal. The relationship between the doctors and OCA is predicated on OCA assuming and executing certain responsibilities that give it control over the practice's operations in exchange for a share of the profits. OCA offers no guidance on how to sever any of the unlawful provisions. And it cites no authority for the proposition that a court should ignore the rule that illegal contracts shall not be enforced where the parties are *in pari delicto*, as is the case here, and enforce a severability clause. Accordingly, the Court affirms the bankruptcy court's decision that the parties are to be left where they are found.

**V.   CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the judgment of the bankruptcy court.

New Orleans, Louisiana, this <u>11th</u> day of March 2008.

_____
                SARAH S. VANCE
        UNITED STATES DISTRICT JUDGE